UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CALEB BOLAND, )<br>)<br>   Plaintiff )<br>)<br>   v. )<br>)<br>RODNEY BOUFFARD, et al., )<br>)<br>   Defendants ) | Civil No. 16-111-JDL |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to F. R. Civ. P. 56(a) and Local Rule 56, defendants hereby move for summary judgment. As grounds for this motion, defendants state that there is no issue of material fact and that defendants are entitled to judgment as a matter of law. Specifically, defendants state:

 1. On the facts established in the record, defendants were not deliberately indifferent to a significant risk of serious harm to Micah Boland; and

 2. Even if defendants were aware of a significant risk of harm to Boland, they took reasonable steps to avert that risk.

## STATEMENT OF FACTS

This case arises out of the murder of plaintiff's decedent, Micah Boland, a prisoner incarcerated at the Maine State Prison (MSP), by another prisoner, Richard Stahursky, on February 28, 2014. Caleb Boland, personal representative of the estate of Micah Boland, brings survival and wrongful death claims alleging that defendants Rodney Bouffard, the prison's warden, Michael Tausek, deputy warden, and Antonio Mendez, unit manager of the Close Unit, where Boland and Stahursky were housed and where the murder was committed, subjected

Boland to cruel and unusual punishment in violation of Boland's rights under the Eighth Amendment by failing to protect Boland from Stahursky.

Defendant Bouffard was hired as warden by then-commissioner Joseph Ponte in 2013. Bouffard had previously been employed as the Superintendent of the Long Creek Youth Development Center, a state juvenile facility. At the time Bouffard was hired, the Department of Corrections, under Ponte's leadership, was attempting to reduce the number of prisoners kept in segregation and also reduce the amount of time a prisoner was held in segregation. It was felt that long-term segregation was not an effective way of dealing with problem prisoners.

Defendant Tausek was hired as deputy warden at the prison on July 1, 2013. He had previously worked there as a corrections officer and a sergeant. He became involved in managing prisoners' programs immediately after starting his job  He oversaw the development of programs targeting areas that caused prisoners to re-offend. The goal was to help prisoners move through the system and reduce their custody level.

Defendant Mendez began work as the co-manager of the prison's Close Unit in September, 2013. Mendez had previously been employed as the prison's activities director. Mendez managed two of the housing units, or "pods," in Close Unit and two in the medium custody unit.  Holly Harris managed the other four pods in the Close Unit.

.       Boland's assailant, Stahursky, had been placed in segregation in the Special Management Unit (SMU), in January of 2013 after being discovered in possession of a "shank" or homemade knife. Over the ten years prior to this, Stahursky had a history of violent behavior, including stabbing another prisoner in October of 2003; threatening to stab an officer in August of 2005; stabbing another prisoner in April of 2010; and assaulting an officer in October of 2011. While

in the SMU, Stahursky threatened to assault an unnamed officer. He was also discovered in possession of a shank in February, 2013.

In March of 2013, the SMU unit management team approached Bouffard with a recommendation that Stahursky be released from segregation to general population. At that time, Bouffard and one of the deputy wardens decided not to follow the recommendation and not to move Stahursky from segregation to general population. Several months later, in July 2013, the unit management team again recommended that Stahursky be placed in general population.

In Bouffard's experience, long-term segregation does not work. Evidence-based practice suggested that keeping a prisoner in segregation for an extended period of time would make him worse. In addition, advocacy groups were paying particular attention to the Department's segregation practices and a legislative committee was monitoring how long people were segregated. In addition, the Commissioner was not in support of long-term segregation.

Whether to release a prisoner from segregation was the most difficult decision Bouffard had to make as warden. Bouffard considered any prisoner coming out of segregation a safety risk to other prisoners. The difficulty was balancing the possible risk of releasing a segregated prisoner into general population with the desire to remove the prisoner from the potentially damaging effects of long-term segregation.

At that time, Bouffard felt that there were prisoners at MSP more dangerous than Stahursky. Although he considered Stahursky a prisoner to watch, he had at least twenty prisoners that he was more concerned about. Tausek did not consider Stahursky a problematic inmate, although he acknowledged Stahursky was not doing well in terms of progressing through the system.

Bouffard reviewed Stahursky's history of incidents at the prison. Bouffard determined that Stahursky's behavior had been "fairly stable" since he assaulted an officer two years before. Bouffard decided to release Stahursky into general population. Tausek supported the decision to move Stahursky out of SMU.  The decision was based more on Stahursky's recent behavior than on incidents that occurred years ago.  Tausek did not believe that Stahursky was one of the small percentage of prisoners that would not respond to programming or intervention.

At the time Stahursky was transferred to the Close Unit, Danny Picard was the unit manager.  Prior to this, he had worked as the unit manager in SMU for a year and a half.  Picard believed that Stahursky was one of a handful of prisoners who would never be rehabilitated and that Stahursky knew this and accepted it.  In Picard's view, Stahursky was controlling and manipulative and had a reputation for unexpected violence.  Picard believed that Stahursky did not deserve to live or be in society. He had mixed feelings about returning Stahursky to general population.  Picard didn't like the fact that prisoners in segregation were locked down and it did not help their mental state, but he felt Stahursky should have completed his programming in the SMU before being released into population. Although he was critical of the decision to release Stahursky from SMU, Picard wouldn't say that Bouffard was willing to risk people.  Bouffard certainly had knowledge of the risk, and Picard believed that Bouffard was acting with the best intent, but not with the best information.  Picard agreed with the goals of segregation reduction and rehabilitation, but he disagreed with Bouffard's judgment on this prisoner.

Consideration of Stahursky's history gave Bouffard cause to go slow on his release. He participated with the unit team in deciding to place Stahursky in C-Pod of the Close Unit. Management teams from SMU and the Close Unit worked together to develop a very specialized plan to return Stahursky to the general population, unlike the way they had released other

4

prisoners. The plan called for Stahursky to be out of his cell only when other prisoners were locked in for count and for an officer to be present at all times he was out of his cell. The close unit team was to review his behavior each week and report to Bouffard and the deputy warden. In addition, Stahursky was to be monitored by the prison's Inner Perimeter Security team.

Stahursky was initially transferred to C-Pod of the Close Unit on July 16, 2013. The prison was planning to turn the upper tier of C-pod into a disciplinary pod to keep prisoners who were serving disciplinary segregation time from being placed in the SMU. The lower tier was to be used as transitional housing for prisoners coming out of segregation. In C-Pod, Stahursky was to be locked down 23 hours per day and gradually allowed to earn privileges like more out-of-cell time and a TV.

Shortly after Stahursky was placed in C-pod, the prison wanted to do some painting and other upgrades there, and it was determined that Stahursky could not be housed there while that work was going on. He had not been making sufficient progress, was "acting up" and could not be trusted to work around tools, with which he could make a weapon. The decision was made to transfer Stahursky to B-Pod.

Neither Bouffard nor Tausek was involved directly in the decision to transfer Stahursky to B-Pod, and Mendez had not yet been given the unit manager job there so he likewise was not involved in the decision. The decision to place Stahursky in B-pod would allow staff to manage his out-of-cell time and provide him with an unpaid pod cleaner job in order for him to earn good time. Bouffard agreed with the logic of the plan and was comfortable with it. The unit management team gradually increased the amount of time he had with recreation and other prisoners to assess how he would do, and there were frequent meetings to monitor that.

Some of the prison staff considered B-Pod an "honor pod." Most of the prisoners in B-Pod had jobs in the prison's Industries program and had to maintain good conduct in order to keep their jobs. There was a mix of prisoners in B-Pod, some with histories of violent behavior. The prisoners in B-pod had extra privileges. Bouffard felt that the prisoners in B-Pod would be the first to tell staff if Stahursky were causing problems. Most of the prisoners were away from the housing unit for a significant part of the day. Stahursky was moved to B-Pod on July 16, 2013.

On July 31, 2013 Stahursky was allowed out-of-cell recreation during the same times as the rest of the prisoners in the pod. He was given an unpaid pod cleaner job, allowed to possess property as any general population prisoner and allowed to purchase items through the commissary. He was not allowed to leave the housing unit without an escort.

A couple of months later, Stahursky's restrictions were further reduced. He was allowed to leave the pod go to the chow hall for lunch and for recreation one hour a day. His restrictions were reduced because he was following his behavioral plan.

On September 19, he was removed from feed-in status and allowed to go to the chow hall regularly. On September 25, 2013, Stahursky's behavioral plan was terminated and he was allowed privileges of any other prisoner on the unit. This decision was based on Stahursky's compliance with his case plan. On October 15, 2013, Stahursky asked to be placed in an open, paid position as a hallway cleaner. His request was approved by the unit management team based on "positive behavior and program involvement." However, he got the job on a probationary basis and was not paid for 90 days, an unusual step.

In February, 2014, Unit Manager Harris was copied on an e-mail from Industries Manager Ken Lindsey relaying a report that Stahursky had been using his position as a hallway

6

cleaner to move drugs. Harris forwarded this email to Tausek, adding that several prisoners had reported that Stahursky was trying to bully them out of their afternoon cleaning positions so he could stay out all day. Harris expressed that the unit team would like to fire Stahursky. Tausek asked Harris if these concerns had been discussed with Stahursky and asked her to document any discussions. Harris replied that he had been spoken to about this by the sergeants but that they would revisit this with him and document it. This was done that day by Sgt. Mathiau.

Mendez does not recall discussing Harris's concerns about Stahursky's behavior if he lost his job, and he did not share her concerns. Mendez had been told by other staff and other prisoners that Stahursky was using his position as hallway cleaner to move items between prisoners. Mendez never received actual proof of this, such as someone catching Stahursky doing it. Mendez also received complaints from other prisoners that Stahursky was bossing them around.

Mendez made the decision to fire Stahursky from the paid position as hallway cleaner, but he gave him an unpaid pod cleaning job. He did not discuss this decision with Tausek or Bouffard. .He did not feel he had enough facts to move Stahursky out of the pod. Mendez told Stahursky that staff and other prisoners had reported that he had moved items between prisoners, but did not tell him that others had complained about him being pushy. Stahursky was fired on February 18.

Micah Boland moved into B-Pod on August 2, 2013, a couple of weeks after Stahursky. Mendez had not heard from any source that Boland had a problem with Stahursky prior to the murder. Mendez's predecessor, Picard, who was the unit manager when both Stahursky and Boland first arrived in B-Pod, did not know Boland very well. He was quiet and did not stick out. Picard was not aware that Boland was a sex offender. There was no specific history of

7

animosity between Stahursky and Boland, nor was he aware of any "keep separate" orders between the two. Boland never expressed any fear of Stahursky, he did not ask for protection from Stahursky or any other prisoner, and no one suggested that Boland might need protection.

Prior to the murder, Stahursky expressed to Harris that he thought he lost his job because someone informed on him, but he never suggested it was Boland. Boland never asked to be separated from Stahursky or expressed any concerns about him. Harris does not believe anything could have been done to prevent Boland's murder.

Officer Kaycee Edwards was on duty in B-Pod at the time of the murder. In her experience, Boland was very, very quiet and rarely came out of his cell. She had no knowledge of any prior incidents between Stahursky and Boland. Stahursky was not acting differently before the murder, and he did not seem upset about anything. Nobody knew why he did it.

Stahursky did not know that Boland was a sex offender when Boland first moved into B-Pod. Boland hung out with someone that Stahursky knew, so he thought Boland was a good dude, too. Boland did not have issues with anyone on the pod and stayed to himself. Boland eventually double celled with someone Stahursky knew was not a sex offender, so Stahursky figured Boland was a good dude, too. Stahursky never talked with Boland before the murder.

Three or four days before the murder, Stahursky overheard a conversation about how Boland had molested a girl. Stahursky was confused by the conversation, so he kept an eye on Boland for a day or so. He was stewing over the fact that Boland was a sex offender and decided to teach Boland a lesson. He intended to beat up Boland and stab him but did not intend to kill him. Stahursky never told anyone of his plan to attack Boland. Although he had stabbed people in the past, with Boland he went into an extreme rage very quickly. He had never been that mad in his life and he felt like the top of his head was going to blow off.

Sex offenders are housed in every unit of the prison. Most of the prisoners disliked sex offenders. If Stahursky presented a general danger to sex offenders, that danger would be present wherever Stahursky was housed.

## ARGUMENT

**1. On the facts established in the record, defendants were not deliberately indifferent to a significant risk of serious harm to Micah Boland.**

Prison officials can be held liable for failing to protect an inmate from assault by another inmate only if they are deliberately indifferent to a known risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825 (1994). Under the Supreme Court's formulation, to be found deliberately indifferent, "…the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. *Id. at 842*. Plaintiff must show that defendants "…are knowingly and unreasonably disregarding an objectively intolerable risk of harm." *Id. at 846*. The First Circuit has stated that the "deliberate" part of the deliberate indifference test requires an actual, subjective appreciation of the risk of harm. *Burrell v. Hampshire County*, 307 F.3d 1, 8 (1st Cir. 2002).

In *Carter v. Galloway*, 352 F. 3d 1346 (11th Cir. 2003), plaintiff, a medium custody prisoner, was temporarily celled with a maximum security prisoner. Plaintiff asked not to be housed with this prisoner, who had been pacing his cell like a "caged animal," threatening officers and "generally acting in a disorderly manner." *Id*., p. 1348. Plaintiff notified officers that the other prisoner had been acting crazy and had been pressuring plaintiff into participating in a fake hanging. The other prisoner ended up assaulting the plaintiff by stabbing him in the stomach with a shank.

9

The court observed that the defendants "clearly knew" that the assailant was a "problem inmate with a well-documented history of prison disobedience and had been prone to violence" and that they were also aware of the assailant's most recent behavior. *Id.*, p. 1349. However, quoting *Farmer*, the court noted that, to establish liability, plaintiff must show that defendants were "subjectively aware of the substantial risk of serious harm in order to have had a sufficiently culpable state of mind." *Id. (*citation and internal quotation omitted.) "But before defendants' awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [the assailant's] generally problematic nature." The court noted that, although plaintiff complained about the assailant's behavior, he did not make defendants aware of a specific threat from the other prisoner. "Such a generalized awareness of risk in these circumstances does not satisfy the subjective awareness standard." *Id. C.f.*, *Chatham v. Adcock*, 334 Fed. Appx. 281, 293 (11th Cir. 2009), *quoting Lavender v. Kearney*, 206 Fed. Appx. 860 (11th Cir. 2006) ("General knowledge about an inmate's violent tendencies, without more specific information about the risk, does not constitute deliberate indifference."); *Fuller v. County of Charleston*, 444 F. Supp. 2d 494, 498 (D. S.C. 2006) ("Absent some evidence that prison officials were subjectively aware that this inmate was likely to attack Plaintiff, the mere fact that the attacking inmate was classified as potentially violent cannot constitute deliberate indifference.")

Prison officials are under no duty to segregate prisoners indefinitely due to earlier attacks on other prisoners. *Schoelch v. Mitchell,* 625 F. 3d. 1041, 1044 (8th Cir. 2010); *Norman v. Schuetzle*, 585 F. 3d 1097, 1105 (8th Cir. 2000), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009) ("We must give substantial deference to prison officials to

determine the best methods for dealing with dangerous inmates in the volatile environment that is prison life.")

Taken in a light most favorable to the plaintiff, the evidence in this case establishes that Micah Boland's assailant Stahursky had a history of violent and unpredictable behavior toward other prisoners and staff. Although other prisoners who held the same job as Stahursky had complained that Stahursky had threatened them in order to work more hours, there is no evidence that defendants were aware that Stahursky had assaulted any prisoners in B-Pod during the seven months he was housed there before the incident. Moreover, there is no evidence that defendants were aware that Stahursky had made any threats against Boland or that Boland had expressed any fear of harm from Stahursky or any other prisoner. During the six months that they were housed in the same pod, there was apparently no interaction at all between these two prisoners. Stahursky stated that he never even spoke to Boland until the day he killed him. Stahursky testified that he did not form an intent to attack Boland until a day before the attack took place and that he did not tell anyone of his plan to assault Boland. At best, the evidence shows that defendants had knowledge of a general risk posed by Stahursky's violent propensities to the prison population as a whole. This information alone was not sufficient to create an actual, subjective awareness of a substantial risk of the harm that befell Boland.

**2. Even if defendants were aware of a significant risk of harm to Boland, they took reasonable steps to avert that risk.**

Even where prison officials are aware of a substantial risk of harm to an inmate and they fail to prevent the harm, they will be free from liability if they responded reasonably to the risk. *Farmer v. Brennan*, *supra*, at 844. "Any inquiry into the reasonableness of the prison officials'

11

actions 'incorporates due regard for the prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions.'"  *Burrell v. Hampshire County*, 307 F.3d 1, 8 (1st Cir. 2002), quoting *Farmer v. Brennan.*

It is undisputed that, at the time of the events alleged in the complaint, the Department of Corrections was attempting to reduce both the number of prisoners in segregation and the amount of time they spent there.  This was in response not only to increasing public sentiment against segregating prisoners but also to the growing perception that segregation was not an effective way to deal with problem prisoners. It was in this context that the decision to transfer Stahursky to general population and to keep him there was made.

Assuming that defendants were aware that transferring Stahursky from segregation to a general population unit created some measure of risk to the other prisoners in the unit, it must be concluded that defendants took reasonable steps to mitigate that risk.  Stahursky was initially transferred to C-Pod, where he would be locked down and kept away from other prisoners. When it became necessary to move him, defendants planned the move carefully, placing him in a pod where most prisoners were away at their jobs during the day, where the other prisoners were relatively well-behaved and would alert staff if Stahursky was acting up, only allowing him out of his cell when other prisoners were locked in, having the Inner Perimeter Security team maintain a watch on him, and restricting his access to areas outside the pod.  It was only as Stahursky demonstrated compliance with his behavioral plan and maintained relatively good behavior over the course of months that these restrictions were eased and he was allowed more privileges and a paying job.  With the advantage of hindsight, plaintiff no doubt asserts that these measures were not adequate and that defendants should have done a better job.  Yet it is not the function of the court to second-guess the manner in which corrections professionals such as the

defendants perform "the unenviable task of keeping dangerous men in safe custody under humane conditions." The assertion that defendants could have done a better job begs the question of whether defendants were deliberately indifferent to the risks posed to Boland by Stahursky. The record demonstrates that they clearly were not.

## CONCLUSION

For the reasons stated above, defendants request that the court grant their motion for summary judgment and enter judgment in their favor.

January 5, 2018                                  /s/ James E. Fortin

                                                            James E. Fortin
                                                            Assistant Attorney General
                                                            *James.Fortin@maine.gov*

Office of Attorney General
Six State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800

CERTIFICATE OF SERVICE

I hereby certify that, on this date, I electronically filed this document with the court using the ECF system, which will send notice of filing to John Gause, Esq., Eastern Maine Law, LLC, 77 Exchange St., Suite 300, Bangor, ME 04401.

| | |
|---|---|
| January 5, 2018 | /s/ James E. Fortin<br>James E. Fortin<br>Assistant Attorney General |