# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **CALEB BOLAND,** | ) | |
| in his capacity as the Personal | ) | |
| Representative of the Estate of | ) | |
| Micah Boland, | ) | |
| | ) | |
| **Plaintiff,** | ) | **1:16-cv-00111-JDL** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RODNEY BOUFFARD, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On February 28, 2014, Richard Allen Stahursky brutally murdered Micah Boland while they were both confined as inmates at the Maine State Prison. In this federal action, Plaintiff Caleb Boland, the Personal Representative of Micah Boland's estate, alleges that the prison's Warden, Rodney Bouffard, its Deputy Warden, Michael Tausek, and one of its Unit Managers, Antonio Mendez (collectively, the "Defendants"), violated the Eighth Amendment of the United States Constitution by failing to protect Micah Boland from Stahursky. *See* ECF No. 34. The Defendants move for summary judgment (ECF No. 56) pursuant to Fed. R. Civ. P. 56(a) and Local Rule 56, arguing that the Plaintiff cannot prove that (1) the Defendants acted with deliberate indifference to a significant risk of serious harm to Micah Boland; and (2) even if the Defendants were aware of a significant risk of serious harm, they took reasonable steps to avert that risk. For the reasons that follow, I deny the Motion.

# I. FACTUAL BACKGROUND

For purposes of summary judgment the following facts, taken from the parties' statements of material facts (ECF Nos. 57, 60, 85), are viewed in the light most favorable to the non-moving party (here, the Plaintiff). A complete recitation of the voluminous relevant facts is required to assess the Motion using the applicable legal standards.

## A.     The Parties

Warden Bouffard and Deputy Warden Tausek were hired by the Maine State Prison in 2013. At the time, the Department of Corrections was seeking to reduce the number of prisoners kept in segregation, and Deputy Warden Tausek was tasked with developing programs aimed at decreasing recidivism. Unit Manager Mendez began working as the co-manager of the prison's "Close Unit," where both Stahursky and Boland were housed at the time of the murder in 2014, and had previously worked for the prison in other roles.

Micah Boland was committed to the prison in 2008 following a conviction for sexual assault involving a victim under the age of twelve. He was a quiet and peaceful inmate, and he was never disciplined while in the prison.

Richard Stahursky was committed to the Maine State Prison in 2002, and is subject to a 100-year consecutive federal sentence as well as a state sentence, although the record does not reveal the nature of his underlying conviction or the length of his state sentence. Throughout his incarceration, Stahursky repeatedly engaged in violent behavior, including multiple stabbings and assaults. The stabbings, which occurred in 2003, 2004, and 2010, each involved using a shank to

stab an inmate victim who Stahursky believed was a sex offender. The non-stabbing assaults occurred in 2003, 2005, and 2011, and Stahursky injured several corrections officers during the 2011 assault.

Danny Picard, who worked as a Unit Manager in the prison from early 2012 to July 2013, believed that Stahursky was one of the three most violent prisoners in the prison. Prior to Micah Boland's murder, Picard, in his capacity as the Unit Manager of Stahursky's housing unit, repeatedly told Warden Bouffard and Deputy Warden Tausek that Stahursky was manipulative, controlling, and vindictive. He also told Warden Bouffard and Deputy Warden Tausek that Stahursky only complied with orders when it would benefit him, and that Stahursky kept his word when he threatened to harm himself or others.

**B.     The Housing Units**

The prison has three housing units: the Special Management Unit (the "SMU"), the Close Unit, and the Medium Unit. Unit Managers oversee each Unit, and the Unit Managers all report directly to the Deputy Warden (here, Tausek). The two relevant Units are the SMU and the Close Unit. The SMU is a segregated setting that houses inmates who threaten the safety of other inmates. The Close Unit is a general population housing unit in which inmates are allowed out of their cells during the day. It has six "Pods," identified as A through F.

**C.     Stahursky's History Prior to His 2013 Transfer to the Close Unit's C-Pod**

As already noted, prior to 2014 Stahursky stabbed three fellow inmates who he believed were sex offenders. Stahursky told Picard that he had been sexually

abused as a child, and that he took it upon himself to ensure that sex offenders paid a price for their crimes beyond serving out their sentences.

Stahursky also had a history of threatening violence, possessing contraband weapons, assaulting other inmates and corrections officers, and engaging in self-harm. For example, in January 2013, Stahursky was found in possession of an eight-inch sharpened metal shank and was consequently moved to the SMU. Stahursky told officials that he planned to stab several inmates who had reported him for having a shank, but never identified his intended targets. While Stahursky was in the SMU, prison officials found another eight-inch sharpened shank in his cell. While housed in the SMU, Stahursky also committed the following aggressive or violent acts: he threatened to stab another inmate; he jammed his cell door and made deep cuts in his own arm causing arterial spray; he threatened to "cut up" a corrections officer; and he cut a three-inch long, half-inch deep cut in his arm. In connection with the last incident, Stahursky wrote "It's A War" on the wall in blood, and said that he would continue doing this every day until he "got what he wanted." ECF No. 85 at ¶ 15.

It is undisputed that Picard – the sole Unit Manger in the SMU from early 2012 to July 2013 – told Warden Bouffard and Deputy Warden Tausek on multiple occasions that Stahursky acted out violently when he did not get his way. It is also undisputed that from the time Stahursky entered the SMU in January 2013 through July 2013, Warden Bouffard believed that Stahursky would be a threat to other inmates' safety if released into the general population.

Stahursky was moved from the SMU to C-Pod on July 9, 2013, based on a recommendation by Deputy Warden Tausek which was approved by Warden Bouffard.  Generally, prisoners leaving the SMU were placed in C-Pod because it was the most closely watched Pod in the Close Unit.  Before recommending Stahursky's release, Deputy Warden Tausek reviewed Stahursky's incident and disciplinary history, and was aware that he had been placed in the SMU because he posed a threat to other inmates.  Before approving Stahursky's release, Warden Bouffard familiarized himself with Stahursky's history and was aware that Stahursky was a safety risk and had a history of possessing weapons.  Warden Bouffard later testified that Stahursky was released "in a very slow, deliberate way" because he "was probably one of the first inmates that I was somewhat concerned about in a significant way."  ECF No. 57-1 at 6.

Picard disagreed with the decision to release Stahursky, believing that Stahursky needed more time in the SMU before being released into the general population.  Stahursky himself was surprised that he had been released from the SMU, testifying later that due to the threat he posed to other inmates, he "should never have been out in population, period."  ECF No. 85 at ¶ 67.

While in C-Pod, Stahursky's movements were highly restricted: he was locked in his cell while other inmates were out of their cells; a corrections officer was present when he was out of his cell; he was fed in his cell rather than in the dining hall; and he had an escort at all times when he left C-Pod.  Thus, Stahursky was not permitted any unsupervised access to other prisoners.  Also, because he had been "acting up"

while in C-Pod, he was not permitted near work tools that could be turned into weapons.

**D. Events Following Stahursky's Transfer from C-Pod to B-Pod**

The prison began painting and making other improvements to the C-Pod shortly after Stahursky's transfer to it. Because Stahursky was not permitted to be near work tools, he was transferred out of C-Pod (the most closely watched Pod in the Close Unit) to B-Pod, which was considered an "honor pod." Generally, B-Pod inmates were the best behaved inmates in the Close Unit, and the surveillance level in B-Pod reflected that: corrections officers made rounds hourly instead of every half hour; no officers were stationed inside for up to two hours at a time when there were 12 or fewer inmates in the Pod; and there was only one surveillance camera, which was monitored from outside the Pod. When Stahursky was transferred to B-Pod, prison officials planned to return him to the C-Pod within two or three weeks, after the work was completed, although that never happened.

The Plaintiff contends – and the Defendants dispute – that there were more sex offenders housed in B-Pod than in other areas of the prison. Ordinarily, prison officials consider an inmate's hatred for sex offenders when making housing decisions to ensure inmate safety. It is undisputed that Stahursky initially opposed his transfer to B-Pod because, as he put it, "they're all a bunch of sex offenders in there." ECF No. 85 at ¶ 42. Picard knew that Stahursky did not want to be placed in B-Pod and he stated his concerns about returning Stahursky to the general population – and the B-Pod in particular – to Warden Bouffard and Deputy Warden Tausek whenever they met and discussed Stahursky. Picard believed that Stahursky

presented an increased risk of violence while he was in B-Pod because he would be left unsupervised for up to two hours at a time.

On July 25, 2013, after a few weeks in B-Pod, Stahursky requested more freedom to walk around the Pod. On July 27, he was given an unpaid cleaning job, which gave him access to paint scrapers, rollers, and screwdrivers, which could all be converted into weapons. On July 30, Picard e-mailed Deputy Warden Tausek, Warden Bouffard, and other prison officials to discuss Stahursky's July 25 request. He wrote, in relevant part, that "[Stahursky] wants regular [] recreation time and more that we cannot safely do. He is making threats to act up again (reportedly) and these are why he should have stayed in [the SMU] until a full no limits plan was made for him." *Id.* at ¶ 52.

Despite Picard's reservations, on July 31 Stahursky's restrictions were relaxed and he was permitted to be out of his cell with other inmates from 7 a.m. to 9 p.m. Although Picard signed off on the change he did not agree with it, and he made that clear to Warden Bouffard and Deputy Warden Tausek. Five days later, Picard resigned from the prison, in part because he felt that his input had been disregarded. On August 28, Stahursky's restrictions were loosened again, so he was permitted to eat lunch in the dining hall seven days per week.

On September 9, Defendant Antonio Mendez replaced Picard as the Unit Manager in charge of the B- and C-Pods. Previously, Mendez was a sergeant in the SMU and had therefore known Stahursky for several years. Mendez was aware that Stahursky was violent, that other inmates were afraid of him, that he had deceived

staff members on multiple occasions, and that he was manipulative, high strung, and very persistent.

**E.  Stahursky's Paid Unit Cleaner Job in B-Pod**

Based on Stahursky's compliance with his case plan, all of his remaining restrictions were removed on September 25, 2013, and from then on he was treated like any other inmate in the general population.  Warden Bouffard and Deputy Warden Tausek had regular contact with Stahursky and were aware of this change. On Deputy Warden Tausek's recommendation, on October 16 Stahursky was given a paid job as a Close Unit Cleaner, which involved cleaning the spaces between the Pods, as well as painting and performing minor maintenance jobs.  Paying jobs are a privilege in the prison, and Stahursky was given the job on a probationary basis, meaning he was not paid for the first 90 days.  As a Unit Cleaner, Stahursky had access to eight-inch screwdrivers, paint scrapers, and paint rollers even when he was unsupervised. Warden Bouffard, Deputy Warden Tausek, and Unit Manager Mendez all knew that Stahursky had a job, and all knew that it gave Stahursky access to other Pods and inmates.

Stahursky enjoyed his job as a Unit Cleaner both because it was paid and because it permitted him to work outside of B-Pod which, he believed, minimized his contact with sex offenders.  Eventually, however, he began causing trouble.  On one occasion, Stahursky punched another Unit Cleaner in the face, causing the other inmate to quit his job.  In January 2014, a prison staff member e-mailed Deputy Warden Tausek to discuss concerns that some corrections officers had voiced about Stahursky.  There was a general concern that allowing Stahursky to work as a paid

Unit Cleaner rewarded his bad behavior, and that it was unsafe to give him screwdrivers that, without proper supervision, could be used as weapons. Tausek responded via e-mail, copying both Warden Bouffard and the Deputy Warden of Security, and stating that the "team" would address the concerns.

By the end of January 2014, several inmates and staff members had approached Mendez and reported that Stahursky was using his Unit Cleaner job to distribute illegal drugs and unauthorized commissary items. Also, a prison staff member e-mailed other staff members – including the Commander and Corporal of the Inner Perimeter Security (colloquially, the "prison police") – alerting them that an inmate had approached him and reported that another inmate was moving drugs by taking them to Stahursky, who in turn distributed them throughout the Close Unit Pods. A prison official forwarded the e-mail to Deputy Warden Tausek, adding that she had heard the same information from "numerous informants," that she had been told Stahursky was "attempting to strong arm and bully [other cleaners] out of their jobs in the afternoons so that he can stay out all day," and that the team wanted to fire him. ECF No. 57-19 at 1-2. Because his firing would "result in [Stahursky's] being moved from B-Pod," the official went on to write, "I am going to assume, his behavior will go downhill fast and I am concerned, violently. How would you like us to proceed with the situation?" *Id.* at 1-2. Tausek replied within ten minutes, again copying Bouffard and the Deputy Warden of Security, and directed the official to sit Stahursky down, reestablish expectations with respect to his job, and tell him to return to his Pod more quickly. *See id.* He also asked the official to document the conversation. *See id.*

By early February, Unit Manager Mendez was aware that Stahursky was entering hallways outside of his normal shift times, telling corrections officers that he was scheduled to work when he was not so that he could get out more often, and bullying other inmates out of their shifts so that he could work more. Mendez also knew that other inmates were afraid to confront Stahursky because they feared he would retaliate. In February 2014, Stahursky's uncle, who was also an inmate in the prison, told Mendez that Stahursky had tricked him into delivering an illegal narcotic a few months earlier. Warden Bouffard and Deputy Warden Tausek were also aware that inmates had reported this behavior.

During this period, Unit Manager Mendez met with Warden Bouffard and Deputy Warden Tausek nearly every morning, and Mendez and other staff members would discuss ongoing issues in the Close Unit. The Plaintiff contends, but the Defendants dispute, that at one of those meetings Mendez expressed his belief that Stahursky would react violently if he lost his paid job.

## F. Terminating Starhursky's Employment

On February 18, 2014, after contraband was discovered in a floor cleaning machine, Unit Manager Mendez terminated Stahursky's employment, although he was permitted to work as an unpaid Pod Cleaner and remain in B-Pod. Ordinarily, inmates could only stay in B-Pod if they were not engaging in misconduct and had paid jobs, but Mendez did not believe that he had sufficient proof of misconduct to justify moving Stahursky out of the Pod. By permitting Stahursky to stay in B-Pod after he lost his paid job, Mendez did not follow the prison's ordinary practice.

After Stahursky lost his paid job, he had daily conversations with Mendez in which he made it clear that he was angry. He denied having passed any contraband, demanded to know who had reported him, and indicated that he thought a sex offender had reported him, stating that they were "taking a [expletive] sex offender's word over mine."

The Plaintiff alleges, and the Defendants dispute, that during the ten-day period after his employment was terminated, Stahursky went to Mendez's office every day and asked whether the prison police had initiated an investigation into the allegations against him. Boland also alleges, and the Defendants dispute, that Stahursky told Mendez that if the prison did not investigate the allegations, he would perform his own investigation. Soon, the "prison talk" in the hallway indicated that Stahursky thought someone had turned him in. Mendez refused to tell Stahursky who reported him because Mendez was concerned that Stahursky would attack anyone who he thought had turned him in.

After Stahursky lost his paid job the Defendants did not do anything out of the ordinary to protect inmates from Stahursky, did not separate him from sex offenders, and did not monitor him more closely than the other inmates. In addition, contraband in Stahursky's cell went undetected: After Boland's murder, thirty-two hairbrushes were found there. Moreover, Bouffard testified that Stahursky should have been on a prison police watch list at the time of the murder, which would have subjected him to heightened monitoring including closer observation, mail checks, and more frequent or thorough cell searches. The Plaintiff contends that, at the time of the

murder, Stahursky was not on the watch list, and that none of the Defendants requested that he be placed on it.

## G. The Murder

Three or four days before Micah Boland's murder, Stahursky learned from other inmates that Boland was a sex offender who had molested a young girl. This enraged Stahursky because he had been folding Boland's laundry, which he would have refused to do had he known Boland's history. Stahursky was already frustrated about "being stuck in the pod all day long" with sex offenders, and stewed over his belief that Boland was laughing at him while Stahursky folded the laundry. *Id.* at ¶ 141.

On February 28, 2014, Stahursky entered Boland's open cell. He punched Boland in the face, knocking him to the ground. Stahursky covered the cell window with a black piece of paper, and bound Boland's hands behind his back. Stahursky stabbed Boland 80 times in the face, neck, chest and abdomen with two seven-inch sharpened shanks. While Boland lay dying on the floor, Stahursky kicked him in the face. All the while, the single corrections officer assigned to B-Pod sat at her desk. She was unaware of the ongoing crime until moments after the murder, when Stahursky dropped the shanks he had used to kill Boland on her desk.

Stahursky never planned to kill Boland; he wanted to beat him up, stab him, and teach him a lesson.[1] Once the attack began, however, he flew into an extreme rage.

---

[1] There is an evidentiary dispute with respect to statements made by Stahursky during a police interview approximately four hours after the murder that pertain to Stahursky's motive. During the interview, Stahursky

## II. LEGAL ANALYSIS

## A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In conducting this analysis, "[a]ll facts in the record, as well as all reasonable inferences to be drawn therefrom, are drawn in favor of the nonmovant."  *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015).  If, in reviewing the record, the court determines that there is sufficient evidence to support findings in favor of the non-moving party, a trial-worthy controversy exists and summary judgment will be denied.  *Id.* at 77-78.  ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for

---

said that he believed Boland had turned him in to prison officials for passing contraband. Those statements are stricken as inadmissible hearsay.

As the Defendants argue, the statements in controversy are out-of-court statements being used to prove the truth of the matter asserted.  They do not qualify, as the Plaintiff contends, as a hearsay exception under Rule 803(3) for "then-existing mental, emotional, or physical condition," because the exception requires *substantial contemporaneity*, and the four-hour gap between the murder and police interview undercuts the claim of contemporaneity.  *See U.S. v. Rivera-Hernández,* 497 F.3d 71, 81 (1st Cir. 2007).  Additionally, the statements cannot, as the Plaintiff also argues, qualify for the exception by showing Stahursky's state of mind at the time of the post-murder interview (which permits an inference as to Stahursky's state of mind at the time of the murder) because "[t]he premise for admitting hearsay statements evidencing state-of-mind is that such statements are reliable because of their spontaneity and [the] resulting probable sincerity." *Horton v. Allen,* 370 F.3d 75, 85 (1st Cir. 2004) (internal quotation marks and citations omitted (alteration in original)).  Using Stahursky's post-murder state-of-mind to establish his state-of-mind at the time of the murder would cut against Rule 803(3)'s underlying rationale.

The statements also do not qualify for the residual hearsay exception.  Fed. R. Evid. 807(a).  "The residual exception to the hearsay rule is one intended to be used very rarely, and only in exceptional circumstances." *United States v. Benavente Gomez,* 921 F.2d 378, 384 (1st Cir. 1990) (internal citation omitted).  The Plaintiff has failed to explain why this is such an "exceptional circumstance" as to support the residual exception.  Because the statements Stahursky made to the police are hearsay statements that do not fit into any exception, I do not consider them.

the nonmoving party.") (internal quotation marks omitted). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

**B.    Eighth Amendment Violations**

The Amended Complaint asserts that the Defendants violated Micah Boland's Eighth Amendment right to be free from cruel and unusual punishment because they were deliberately indifferent to his safety and subjected him to a substantial risk of serious harm. While the U.S. Constitution "does not mandate comfortable prisons," it also "does not permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citation omitted). The Cruel and Unusual Punishment Clause of the Eighth Amendment, as applied to the states through the Fourteenth Amendment, generates a duty on the part of prison officials "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833; *see also Bean v. Reed*, 1:13-cv-00196-NT, 2016 WL 2888967, at *6 (D. Me. May 17, 2016). "That duty has its origins in the forced dependency of inmates." *Giroux v. Somerset Cty.*, 178 F.3d 28, 31 (1st Cir. 1999). As explained in *Farmer*, "[h]aving incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, [and] having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." 511 U.S. at 832 (internal citation, quotation marks, and brackets omitted).

Yet, "[n]ot 'every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability.'" *Lakin v. Barnhart*, 758 F.3d 66, 70 (1st Cir. 2014) (quoting *Farmer*, 511 U.S. at 834). To demonstrate an inmate's constitutional rights were violated, a plaintiff faces the heavy burden of showing that the inmate

was (1) "incarcerated under conditions posing a substantial risk of serious harm;" and (2) "the prison official [accused of failing to prevent harm] acted, or failed to act, with deliberate indifference to inmate health or safety." *Id.* (internal quotation marks omitted). "In other words, a plaintiff must satisfy both an objective standard (substantial risk of serious harm) and a subjective standard (deliberate indifference) [] to prove a claim of deliberate indifference." *Bean v. Reed*, 2016 WL 2888967, at *6. (citing *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc)). The subjective standard, in turn, contains two subparts: the "deliberate" element, which assesses whether prison officials were actually aware of the risk to the inmates, and the "indifference" element, which assesses whether prison officials took reasonable steps to abate the risk. *See Burrell v. Hampshire Cty.*, 307 F.3d 1, 7-8 (1st Cir. 2002).

Thus, the Defendants' Motion turns on an evaluation of whether: (1) Boland was incarcerated under conditions which objectively imposed a substantial risk of serious harm; (2) the Defendants were subjectively aware that the substantial risk existed; and (3) the Defendants, despite their awareness of the risk, failed to take reasonable steps in response. I consider each argument.

## 1. Substantial Risk of Serious Harm

"To meet the objective requirements of a deliberate indifference claim, [the] Plaintiff must present evidence that Defendants had knowledge of facts that would cause a reasonable person in their position to conclude there was a substantial risk that [the] Plaintiff would suffer serious harm." *Bean*, 2016 WL 2888967, at *6. A "substantial risk" has been variously characterized as a risk that is "objectively intolerable," *see Lakin*, 758 F.3d at 71, or "an unusually serious, or grave risk." *See*

*Ramirez-Lluveras v. Rivera Merced*, 759 F.3d 10, 21 (1st Cir. 2014) (internal quotation marks omitted). Significantly, "it does not matter . . . whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

Based on the summary judgment record, there is a genuine dispute of material fact which, if decided in the Plaintiff's favor, could support a finding that at the time of Micah Boland's death inmates convicted of sex offenses who lived in B-Pod, as well as inmates who Stahursky might suspect of having reported him to authorities, faced a significant risk of serious harm. When Stahursky committed the murder, he had a long record of violent in-prison behavior, which was often directed at sex offenders. *See* ECF No. 85 at ¶¶ 4-9. He had also been moved into the SMU after officials discovered that he had an eight-inch sharpened shank and planned to stab several inmates who he believed had reported him to authorities in the prison. *See id.* at ¶¶ 10-11. Moreover, the record indicates that if Stahursky felt wronged or slighted, he was prone to react violently. Given Stahursky's history of violent and vengeful conduct, it is evident that, as a prison official stated, once he lost his job his behavior was likely to "go downhill fast" in a violent way. ECF No. 57-19 at 1-2. Accordingly, by leaving Stahursky in the minimally surveilled B-Pod after his firing, without putting him on a watch list that would ensure that he was observed more closely or otherwise taking steps to protect general population inmates, the Defendants may have exposed inmates similar to Stahursky's previous victims (sex offenders) and inmates who he might suspect of having informed on him, to an unusually grave risk of harm. *See* ECF No. 85 at ¶¶ 114, 134-136. Thus, a jury could reasonably conclude

that at the time of Micah Boland's murder Stahursky objectively posed a substantial risk of serious harm to inmates in Boland's position.

### 2. The Defendants' Awareness of the Risk of Harm

Once a plaintiff has presented evidence establishing the objective existence of a substantial risk, the plaintiff must demonstrate that the defendants had a "sufficiently culpable state of mind," i.e., a state of "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. "The 'deliberate' part of 'deliberate indifference' [requires] that a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Burrell*, 307 F.3d at 8 (quoting *Farmer*, 511 U.S. at 837).

In determining whether prison officials drew the inference of a substantial risk, a fact-finder may infer knowledge based on the obviousness of the risk:

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842-43 (internal quotation marks omitted). Prison officials may, in response, show that "even if the risks were obvious to others, it was not obvious to them." *Burrell*, 307 F.3d at 8. For the following reasons, the risks of harm to inmates in Boland's position were sufficiently obvious that a fact-finder could reasonably

conclude that Bouffard, Tausek, and Mendez must have drawn the inference that a substantial risk of harm to Boland existed.

Warden Bouffard, Deputy Warden Tausek, and Unit Manager Mendez were aware of Stahursky's history, which included violence against sex offenders and attempted violence against those he believed had wronged him. *See* ECF No. 85 at ¶¶ 4-10, 30, 31, 75. Specifically, they were aware that Stahursky had committed three premediated stabbings, each targeted at someone he believed was a sex offender. *See id.* at ¶ 4; ECF No. 74-6 at 10-20. They were also aware that in 2013 Stahursky was discovered in possession of an eight-inch sharpened metal shank and that, at the time, he told officials that he planned to stab inmates who had informed on him. *See id.* at ¶¶ 10-13. Even after he was placed in the SMU for that conduct, Stahursky was found in possession of another eight-inch sharpened shank. *See id.* at ¶ 14. Thus, the Defendants were aware of Stahursky's preferred weapon (sharpened shanks), history of stabbings, and the profile of his victims (sex offenders and those he believed had informed on him).

Warden Bouffard and Deputy Warden Tausek were also aware of the danger that Stahursky posed to sex offenders based on the warnings that they received from Picard. Picard knew that Stahursky was sexually abused as a child and that he took it upon himself to ensure that sex offenders paid a price for their crimes, beyond serving out their sentences. *See* ECF No. 85 at ¶ 57. Picard opposed Warden Bouffard's decision to transfer Stahursky from the SMU to C-Pod, and in every Stahursky-related meeting he had with Warden Bouffard and Deputy Warden Tausek, Picard warned them that Stahursky was vindictive and manipulative, and

acted out violently when he did not get his way. *See id.* at ¶¶ 21-22. When Stahursky was transferred from C-Pod to B-Pod, Picard specifically warned Warden Bouffard and Deputy Warden Tausek that Stahursky would likely become violent toward the sex offenders housed there. *See id.* at ¶ 57.

Picard's warnings did not fall on deaf ears, as demonstrated by the deliberate manner in which Stahursky was initially reintroduced into the general population. Warden Bouffard testified that Stahursky was released in a "very slow deliberate way" because he "was probably one of the first inmates that [he] was somewhat concerned about in a significant way." ECF No. 57-1 at 6. To that end, Stahursky's restrictions were supposed to be gradually loosened, and the Defendants planned to keep him in C-Pod – the most closely watched pod in the Close Unit. *See* ECF No. 62 at ¶ 15, 16; ECF No. 85 at ¶ 32. However, the Defendants did not adhere to that plan and soon transferred Stahursky into the more lightly surveilled B-Pod. After only a few weeks, he was given the freedom to walk around the pod and a job that gave him access to paint scrapers, rollers, and screwdrivers, all of which could serve as weapons. *See* ECF No. 85 at ¶¶ 44, 50, 51, 68, 71.

It is undisputed that the Defendants were aware of these changes; the Warden, Unit Managers, Unit Sergeants, and Case Workers participated in "daily meetings" so that each inmate was discussed at least once or twice a week, and problem inmates were discussed daily. *See* ECF No. 85 at ¶¶ 61-63, 68-69. Picard, Warden Bouffard, and Deputy Warden Tausek also frequently attended case management meetings where the status of – and plans for – inmates were discussed. *See id.* at ¶ 61.

A few months after Stahursky was transferred to B-Pod, a prison official forwarded Deputy Warden Tausek an e-mail from a prison staff member which stated that an inmate had reported that Stahursky was distributing drugs in the Close Unit Pods. *See id.* at ¶¶ 105-106. When the official forwarded the e-mail to Deputy Warden Tausek, she added that she had heard the same information from "numerous informants," and that the team wanted to fire Stahursky. *See* ECF No. 57-19 at 1-2. She went on to write that if Stahursky's employment was terminated he would have to be transferred out of B-Pod, and stated, "I am going to assume, his behavior will go downhill fast and I am concerned, violently. How would you like us to proceed with the situation?" *Id.* When Deputy Warden Tausek responded, he copied Warden Bouffard. *Id.* The Plaintiff also contends, although the Defendants dispute, that during a daily meeting with Deputy Warden Tausek and Warden Bouffard, Unit Manager Mendez expressed a similar belief that if Stahursky lost his paid Unit Cleaner job he would react violently. *See* ECF No. 85 at ¶¶ 101, 103; ECF No. 74-3 at 63-65. Based on the foregoing largely undisputed facts, it is reasonable to infer that the Defendants were aware that if Stahursky lost his paid Unit Cleaner job, he was likely to react with violence.

In addition, after he lost his job, Stahursky spoke with Unit Manager Mendez every day and made it clear that he was angry. *See* ECF No. 85 at ¶ 117. Stahursky demanded to know who had reported him, and expressed his belief that the reporting inmate was a sex offender. *See id.* In addition, the Plaintiff alleges, although the Defendants dispute, that Stahursky threatened to perform his own investigation. *See id.* at 19. It is undisputed that Unit Manager Mendez believed that Stahursky would

attack another inmate if he believed that the inmate had reported him. *See id.* at ¶ 122.

Viewing the summary judgment record in the light most favorable to the Plaintiff as the non-moving party, a jury could reasonably conclude that once Unit Manager Mendez terminated Stahursky from his job, the possibility that Stahursky would physically harm another inmate in B-Pod became obvious to the Defendants. Given the preceding disputed and undisputed facts, a jury could therefore reasonably determine that the Defendants were subjectively aware of the danger Stahursky posed – particularly to sex offenders – after his employment was terminated.[2]

### 3. Defendants' Response to the Risk of Harm

The second half of the deliberate indifference analysis recognizes that "[p]rison officials cannot be indifferent [] if they are unaware of the risk. But even if they are aware, they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided." *Burrell*, 307 F.3d at 8 (1st Cir 2002) (citing *Farmer,* 511 U.S. at 844). This reflects the concept that "[a] prison

---

[2]   In opposing this conclusion the Defendants rely on *Carter v. Galloway*, 352 F.3d 1346 (11th Cir. 2002). In *Carter*, the Plaintiff was assigned to a cell with an inmate who asked the Plaintiff to help him fake a hanging so that he could be transferred to the medical prison – when the Plaintiff declined, the inmate threatened that the Plaintiff would help him "one way or another." *Id.* at 1348. The Plaintiff told the Defendant prison officials that the other inmate was acting crazy, was planning to fake a hanging, and had said that the Plaintiff would help him one way or another. *See id.* The Plaintiff was not moved from the cell, and within a week, the other inmate stabbed the Plaintiff in the stomach with a shank. *See id.* The prison officials were, however, found not liable for deliberate indifference, largely because the record lacked evidence of their subjective awareness of the risk. *Id.* at 1350.

*Carter* is distinguishable from this case because in *Carter* the prison officials were privy to a limited amount of information about the threatening inmate, all of which was supplied by a single inmate, the plaintiff. *See id.* at 1349-50. Plus, in supplying that information, the plaintiff did not articulate a particularized threat. *Id.* Here, the record indicates a substantial amount of information was available to the Defendants from a variety of sources regarding Stahursky's history of violence, including stabbings, as well as the likelihood that he would lash out in the days after he lost his job. In addition, the information indicated that Stahursky posed a particularized threat to sex offenders living in B-Pod, including Boland.

official's duty under the Eighth Amendment is to ensure reasonable safety," and an inquiry into the reasonableness of an official's response must give "due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 at 844-45 (internal quotation marks omitted). Determining which actions constitute a reasonable response to a substantial risk varies case-by-case. The decisions in *Burrell*, 307 F.3d at 8 and *Gebo v. Thyng*, No. 11-CV-047-JD, 2012 WL 4848883 (D. N.H. Oct. 11, 2012) are instructive.

In *Burrell*, the plaintiff was a pretrial detainee who was assaulted and injured by a fellow detainee after he and his wife complained about that detainee. 307 F.3d at 4-7. Ultimately, the court concluded that the officials acted reasonably when they refused to move the threatening inmate out of Burrell's cell block because the officials believed that Burrell – who told officials that he was proficient in martial arts and a decorated war hero – was capable of defending himself. *See id.* at 8-9. The court also noted that Burrell never requested placement in protective custody. *See id.* at 9; *see also Ruiz-Rosa v. Rullan*, 485 F.3d 150 (1st Cir. 2007) (finding no deliberate indifference where an inmate died of septicemia when a prison doctor failed to perform a follow-up evaluation after draining the inmate's abscess based on the doctor's lack of awareness of the risk).

In contrast, *Gebo* arose out of an attack on an inmate by a gang member. After the attack, the inmate requested protective custody multiple times, specifically because he was scared that he would be attacked by gang members again. *See Gebo*, 2012 WL 4848883, at *2. The inmate's requests for protective custody were denied without explanation, and when he returned to the general population he was again

assaulted by gang members. *See id.* The District Court denied summary judgment, concluding that, unlike in *Burrell*, there was no evidence that the inmate could protect himself and the prison officials were aware of the specific risk to the inmate. *Id.* at *4; *see also Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484 (1st Cir. 2011) (finding deliberate indifference where a physician assistant working in jail failed to treat an inmate's HIV in a timely manner, and the physician assistant had a financial interest in not providing immediate treatment, knew the inmate had HIV, knew the inmate had not had access to his antiretroviral regimen for a month, and knew of the inmate's symptoms.); *Giroux v. Somerset Cty*, 178 F.3d 28, 33 (1st Cir. 1999) (finding genuine issue of fact precluding summary judgment regarding deliberate indifference where a jail official left an inmate alone in a room with another inmate who had repeatedly threatened him, noting that there were "no circumstances that constrained [the official] from responding to protect [the plaintiff inmate]").

Here, as was true in *Gebo*, there are triable issues as to whether Warden Bouffard, Deputy Warden Tausek, and Unit Manager Mendez failed to reasonably respond to the substantial risk to Micah Boland's safety that arose after Stahursky was terminated from his job. The manner in which Stahursky was terminated is important: while his transfer into the general population was originally planned to occur in a "slow, deliberate way," the Defendants took no steps to protect general population inmates (particularly sex offenders) from Stahursky once his job was terminated, despite Stahursky's record of extreme violence and warnings from two prison officials that he would likely become violent. *See* ECF No. 57-19 at 1-2; ECF No. 74-3 at 63-65; ECF No. 85 at ¶¶ 101, 103. Further, the Defendants did not follow

the prison's standard procedure and permitted Stahursky to stay in B-Pod, the most lightly surveilled pod, after he lost his job. *See* ECF No. 85 at ¶¶ 113-115.

Based on the undisputed and disputed material facts, a jury could determine that the Defendants did not reasonably respond to the risk Stahursky posed to prisoners in Micah Boland's position, and that the Plaintiff has thus articulated sufficient evidence to establish the "indifference" element of the deliberate indifference standard.

## III.    CONCLUSION

Based on the summary judgment record considered in the light most favorable to the Plaintiff as the non-moving party, the high bar imposed on prisoner claims asserting deliberate indifference by prison officials may be met in this case. Accordingly, the Defendants' Motion for Summary Judgment (ECF No. 56) is **DENIED**.

**SO ORDERED.**

**Dated this the 20th of July, 2018.**

_____ /s/ JON D. LEVY _____
**U.S. DISTRICT JUDGE**
